UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS D. HANSEN,

                    Plaintiff(s),          CASE NUMBER: 04-74379
                                           HONORABLE VICTORIA A. ROBERTS

v.

DONALD WILLIAMSON, individually and
in his official capacity as Mayor of the
City of Flint, and the CITY OF FLINT,

                    Defendant(s).
_____/

ORDER

I.    INTRODUCTION

       This matter is before the Court on: 1) Defendant Williamson's Motion for

Summary Judgment (Doc. #31), and 2) Defendant City of Flint's Motion for Summary

Judgment (Doc. #26).  For the reasons stated, Defendant Williamson's Motion is

**GRANTED IN PART** and **DENIED IN PART**.  Defendant City of Flint's Motion is

**GRANTED** in its entirety.

II.   BACKGROUND

       Plaintiff Thomas D. Hansen is an independent contractor with Booth

Newspapers, Inc.  He delivers the Flint Journal, a local newspaper circulated in Flint,

Michigan.  He brings this action against Defendants City of Flint ("the City" or "Flint")

and Flint Mayor Donald Williamson.

       On September 21, 2004, Plaintiff was delivering the Flint Journal to regular

1

subscribers who worked at Flint City Hall.  While on the elevator, Plaintiff encountered

Defendant Williamson.  Plaintiff says Williamson noticed his newspapers.  Williamson

asked Plaintiff what he was doing.  When Plaintiff told him, Williamson asked him if he

was aware of an Executive Order Williamson enacted which Williamson said precludes

such deliveries.  Williamson was referring to Executive Order #04-0007, which he

enacted on July 7, 2004.  It prohibits employees from reading, storing or bringing

newspapers and other reading materials unrelated to City business on City property:

> Section 2.  *Prohibited Storage of Reading Materials.* All employees
> of the City of Flint are hereby prohibited from bringing unto any City
> property, or into any City vehicle, newspapers, magazines, or other
> reading materials that are unrelated to City business.

Pl. Exh. 8.  One week later, Williamson enacted a second Executive Order, #04-0005,

to establish a policy that all Executive Orders are to be enforced by City department

heads and supervisors.  *See* Pl. Exh. 9.  Failure to enforce the Orders would result in

disciplinary action, including possible termination.  *Id*.

Asserting that Williamson did not have the authority to prohibit his deliveries,

Plaintiff told Williamson that it would take a court order to stop him from delivering

papers at City Hall.  Williamson then asked Plaintiff if he had a peddler's license.  When

Plaintiff said "no," Williamson said "I'll show you how much authority I have," and used a

cell phone to call Flint Chief of Police Gary Hagler.  Pl. Exh. 10 at p. 50.  Williamson told

the Chief that he wanted Plaintiff arrested for peddling without a license.  Plaintiff asked

Williamson if he was going to have him arrested for delivering papers to subscription

customers.  Williamson said "yes."  Williamson then asked Plaintiff to give the names of

his subscribers.  Plaintiff refused.

The Chief sent Captain Scott Sutter and Sergeant Michael Lipp.  Plaintiff and Williamson were still in the elevator when Sutter and Lipp arrived.[1]  Williamson told them that he wanted Plaintiff arrested for peddling without a permit.  Plaintiff says the officers asked him to step out of the elevator and told him to place his hands against the wall.  The officers then frisked Plaintiff and led him away to the Flint Police Station, which is adjacent to City Hall.  Plaintiff was not handcuffed.

During a brief questioning, Plaintiff says Lipp told him that delivering papers in City Hall was against Williamson's Executive Order.  But, per Plaintiff, the officers said that they did not know whether they would arrest him.  Lipp told Plaintiff that an appearance ticket might be issued.  Lipp says that he considered doing so because Plaintiff said that he sold a paper (presumably that day) to someone who was not a subscriber and who he believed was sent by the Mayor to "set him up."  Plaintiff only denies the statement in an (inadmissible) unsworn affidavit.  Pl. Exh. 21 at ¶6.  But, in his deposition, Plaintiff denied selling any papers to individuals on the day of the incident (although he admitted doing so on a few other occasions).

Sutter conferred with Chief Hagler and the City's legal counsel after he and Lipp questioned Plaintiff.  Based on those discussions, Plaintiff was released.  Plaintiff estimates that the entire incident lasted 25 to 30 minutes.  No charges were ever filed.

---

[1] In his brief, Plaintiff claims that Williamson prevented him from leaving the elevator until the officers arrived.  But, Plaintiff does not offer sworn testimony in support of this claim.  Rather, he relies on Captain Sutter's handwritten notes of a conversation he had with another person who was on the elevator with Plaintiff and Williamson, Jim Kriegsman.  *See* Pl. Exh. 12.  Sutter's notes, however, contain inadmissible hearsay which the Court cannot rely upon when deciding a summary judgment motion.  *North American Specialty Ins. Co. v Myers,* 111 F.3d 1273, 1283 (6th Cir. 1997).

3

The peddler ordinance referenced by Williamson prohibits peddling, soliciting or canvassing in the City of Flint without a license:

> §12-172 License; Peddling or Vending in Certain Area [sic] Prohibited.
>
> (a) It shall be unlawful for any solicitor, canvasser or peddler to engage in such business in the city without first having obtained a license therefor in the manner set forth in this article.  Any license so issued shall not permit any person to engage in the business of peddling or vending any goods, wares or merchandise except in areas zoned for commercial sales.

Pl. Exh. 18.  Peddlers, solicitors and canvassers are defined in the ordinance:

> For the purpose of this article, the following definitions shall apply unless the context clearly indicates or requires a different meaning.
>
> *PEDDLER.*  Any person 18 years of age or older, engaged in the business or occupation of selling or offering for sale, goods, wares, merchandise, flowers, foods or beverages, or in the course of traveling from one location to another, on private or public property in the city.
>
> * * *
>
> *SOLICITOR* or *CANVASSER.*  Any person 18 years of age or older engaged in the business or occupation of taking orders or attempting to take orders, in the course of traveling from one location to another, on private or public property in the city, for the sale and purchase of service, goods, wares, merchandise or any tangible property, for future delivery or for services to be performed in the future, whether or not such individual has, carries or exposes for such sale a sample of the subject of such sale, or whether he is collecting advance payments on such sales or not.

*Id* at §12-171.

A person must apply for a peddler's license through the City.  *Id* at §12-173.  The City Clerk decides whether a license should issue:

> Upon receipt of an application for a license under this article, together with the appropriate fee, the City Clerk shall make such investigation as he deems necessary for the protection of the public

4

good.  If as a result of such investigation, the applicant's character and business reputation are found to be unsatisfactory, the application shall be denied.  If as a result of the investigation the character and business reputation appear to be satisfactory, the City Clerk shall issue a license.

Pl. Exh. 18, §12-175(a).

The day after his encounter with Williamson, Plaintiff says he went to the City Clerk's office and asked whether he needed a peddler's license to deliver newspapers. Per Plaintiff, City Clerk Inez Brown told him that he probably would not need a license. And, Defendants do not dispute Plaintiff's assertion that no news carriers were prosecuted for violation of the ordinance in the five years preceding this incident.

Williamson says he enacted the Executive Order banning newspapers and other literature in response to his observation that City workers were reading newspapers and other literature during times when they were supposed to be working.  Plaintiff opines, however, that Williamson bears a grudge against the Flint Journal specifically.  The grudge, per Plaintiff, stems from editorials in the Flint Journal critical of Williamson and/or with which he disagreed.  In fact, months after he was elected (and presumably before this incident) Williamson publicly called for a boycott of the Flint Journal.  And, in an interview Williamson gave, during which he referred to this incident, he is quoted as saying that Flint Journals are not allowed on City Hall property, but that his office[2] puts the Detroit Free Press in the lunchroom.  Pl. Exh. 4 at pp. 9-10.  Notably, in the same interview, Williamson is also quoted as saying that he does not oppose the sale of Flint Journals by the retail store located in the lobby of City Hall.  *Id* at p. 10.  Williamson did

---

[2]Williamson actually said "we" put the Free Press in the lunchroom.  "We" presumably refers to the Mayor's representatives.

not deny the accuracy of the quotes attributed to him.

Plaintiff alleges that the stop, frisk and arrest of him for delivering newspapers to subscribers infringed upon his First and Fourth Amendment rights in violation of 42 U.S.C. §1983.  Defendants request summary judgment on both claims.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on

6

which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.   APPLICABLE LAW AND ANALYSIS

Plaintiff brings his claims under 42 U.S.C. §1983.  "To state a cause of action under §1983, a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law."[3]  *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir. 2003).  Defendant Williamson

---

[3]42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

does not dispute that he was acting under color of state law at all relevant times, and

Plaintiff alleges that Defendants deprived him of his First and Fourth Amendment rights.

Defendants deny any constitutional violation.  Williamson further asserts, in the

alternative, that he is entitled to qualified immunity.  Where the defense of qualified

immunity is raised, the Court must first determine whether a constitutional violation has

been established:

> A court required to rule upon the qualified immunity issue must
> consider, then, this threshold question: Taken in the light most
> favorable to the party asserting the injury, do the facts alleged show
> the officer's conduct violated a constitutional right? This must be the
> initial inquiry.
>
> * * *
>
> If no constitutional right would have been violated were the
> allegations established, there is no necessity for further inquiries
> concerning qualified immunity. On the other hand, if a violation could
> be made out on a favorable view of the parties' submissions, the
> next, sequential step is to ask whether the right was clearly
> established.

*Saucier v Katz*, 533 U.S. 194, 201 (2001)(internal citation omitted).

## A.    Claims Against Williamson

### 1.    Fourth Amendment

Plaintiff alleges that Williamson violated his Fourth Amendment right not to be

arrested without probable cause.  Such claims are typically asserted against the

arresting officer.  However, under its express language, §1983 claims may also be

brought against a government official who *causes* another to be deprived of

constitutional rights:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or ***causes to be***
> ***subjected***, any citizen . . . the deprivation of any rights, privileges, or

8

> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. §1983 (emphasis added).  For instance, an official can be held liable if he

wrongfully instigates events which lead to a deprivation of constitutional rights: "Any

official who 'causes' a citizen to be deprived  of [his] constitutional rights can . . . be held

liable.  The requisite causal connection is satisfied if the [official] sets in motion a series

of events that the [official] knew or should reasonably have known would cause others

to deprive the plaintiff of [his] constitutional rights."  *Connor v Reinhard*, 847 F.2d 384,

396-397 (7th Cir. 1988).  *See also Gutierrez-Rodriguez v Cartagena*, 882 F.2d 553, 569

(1st Cir. 1989); *Johnson v Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  It is on this basis that

Plaintiff asserts his Fourth Amendment claim against Defendant Williamson.  He argues

that Williamson used his authority as Mayor to direct Flint police officers to arrest him,

by falsely asserting that Plaintiff violated the peddler's ordinance.

### a.    Was Plaintiff Arrested?

Before reaching the substance of Plaintiff's claim, the Court must address a

preliminary issue--whether Plaintiff's detention was an arrest, as he claims, or an

investigatory stop, as Defendants claim.  An arrest is only permitted when there is

probable cause to believe that a crime was committed by the arrestee.  *Criss v City of

Kent*, 867 F.2d 259, 262 (6th Cir. 1988).  For a brief, investigatory stop, however, there

only needs to be "a reasonable, articulable suspicion that criminal activity is underfoot."

*Terry v Ohio*, 392 U.S. 1, 27 (1968).

Plaintiff says that the circumstances surrounding his detention require a finding

that it was an arrest.  Specifically, Captain Sutter and Sergeant Lipp asked him to step

9

out of the elevator, frisked him for weapons, and led him away to the police station for questioning.  Even though he was never told that he could not refuse to comply with the officers, Plaintiff testified that he did not feel that he was free to leave, and Sergeant Lipp testified that Plaintiff, indeed, was not free to leave before he and Sutter completed their questioning.  Defendants, however, point to several factors as evidence that Plaintiff's detention did not rise to the level of an arrest: 1) per the officers, Plaintiff agreed to go with the officers and never asked to leave; 2) Plaintiff was only taken a short distance to an office area (as opposed to a holding cell or interrogation room) in the police department; 3) Plaintiff was not handcuffed or strong-armed into complying with their requests, and 4) Plaintiff testified that the officers said during the questioning that no arrest decision had been made.

The Court finds that Plaintiff's detention was an arrest, despite Plaintiff's cooperation, the lack of a formal arrest, and the officers' subjective belief that Plaintiff was not under arrest.  "The Fourth Amendment's protections are not limited to 'traditional' arrests . . . ." *Centanni v Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994)(*quoting United States v Canales*, 572 F.2d 1182, 1187 (6th Cir. 1978)).  In fact, even an initially consensual encounter can become a seizure for which probable cause is required when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v Mendenhall*, 446 U.S. 544, 554 (1980).  *See also I.N.S. v Delgado*, 466 U.S. 210, 216 (1984); *Kaupp v Texas*, 538 U.S. 626, 629 (2003).  "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some

10

physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. Also, "it is clear that the line between an investigatory detention and an arrest is crossed 'when the police remove a person from his home or other place in which he is entitled to be *and transports him to the police station,* where he is detained, although briefly, for investigative purposes.'" *Centanni*, 15 F.3d at 590 (*quoting Hayes v Florida*, 470 U.S. 811, 816 (1985)).

Here, the circumstances were such that Plaintiff reasonably believed that he was not free to decline the officers' requests. Captain Sutter and Sergeant Lipp approached Plaintiff in response to Mayor Williamson's call for his arrest. Lipp was in uniform and immediately asked Plaintiff to step out of the elevator, put his hands against the wall and submit to a pat down search. Then, rather than question Plaintiff at the elevator, the officers asked Plaintiff to go with them to the police department. Once at the police department, Plaintiff was subjected to questioning and advised that the officers were deciding whether to (formally) arrest him. Under these circumstances, a reasonable person would not have believed that he was free to ignore the officers and go about his business. Therefore, the Plaintiff's detention amounted to a *de facto* arrest for which probable cause was required.

### b.    Was There Probable Cause for an Arrest?

The Court's next inquiry is whether there was probable cause to believe that Plaintiff violated the peddler's ordinance. Although Plaintiff admits that he did not have a peddler's license, he argues that the ordinance by its plain language did not apply to him. Therefore, Plaintiff asserts that he was not required to have a license to make his

11

deliveries.  Defendants take the opposite position.

Plaintiff's claim hinges on the parties' conflicting interpretations of the peddler's ordinance.  If there was no reasonable basis for finding that the ordinance applied to Plaintiff, there was no probable cause for his arrest.

### i.    Statutory Interpretation

Defendants argued in their briefs that Plaintiff's delivery to subscribers brought him within the definition of a "peddler."  However, during oral arguments, Defendants conceded that, under the plain language of the ordinance, the mere act of delivering to subscribers did not make Plaintiff a peddler.  Consequently, Plaintiff did not need a license for that purpose.

Nevertheless, Defendants argue two alternate grounds for finding that Plaintiff violated the ordinance: 1) Plaintiff allegedly admitted to Sergeant Lipp that he sold a paper to a non-subscriber in City Hall just before his encounter with the Mayor, and 2) Plaintiff admitted that he sold papers to non-subscribers on at least three other occasions.  Per Defendants, these sales bring Plaintiff within the ordinance and constituted a violation of it since Plaintiff had no license.

The Court disagrees.  Regardless of whether Plaintiff made non-subscriber sales in City Hall on the day at issue or on other occasions, the Court finds that, under the plain language of the ordinance, it does not apply to Plaintiff.

In Michigan, interpretation of a local ordinance is a question of law.  *Burt Township v DNR*, 227 Mich. App. 252, 255 (1997).  The same well settled rules that govern construction of Michigan statutes apply to local ordinances.  *Gora v City of Ferndale*, 456 Mich. 704, 711 (1998).  A court's primary goal is to "ascertain and give

12

effect to the intent of the Legislature."  *People v Tombs,* 260 Mich. App. 201, 208

(2003). The first step is to look to the specific language of the statute.  *Id* at 209.  "If the

statute is unambiguous on its face, the Legislature is presumed to have intended the

meaning plainly expressed and further judicial interpretation is not permitted."  *Id*.  "[T]he

court must presume that every word has some meaning and should avoid any

construction that would render any part of the statute surplusage or nugatory."  *People v*

*Borchard-Ruhland*, 460 Mich. 278, 285 (1999).  Undefined terms should be given their

"plain and ordinary meanings," which may be determined by dictionary definitions.

*Koontz v Ameritech Services, Inc*, 466 Mich. 304, 312 (2002).

If there is an ambiguity, a court may go beyond the words of a statute to

determine legislative intent.  "An ambiguity can be found only where the language of a

statute as used in its particular context has more than one common and accepted

meaning."  *Tombs*, 260 Mich. App. at 209.  *See also Colucci v McMillin,* 256 Mich. App.

88, 94 (2003).  In such situations, the court must "'give effect to the interpretation that

more faithfully advances the legislative purpose behind the statute.'" *Tombs*, 260 Mich.

App. at 211 (*quoting People v Adair*, 452 Mich. 473, 479-480 (1996)).  In its analysis,

the court must "look to the object of the statute, the evil or mischief which it is designed

to remedy, and . . . apply a reasonable construction which best accomplishes the

statute's purpose."  *Charter Township of Pittsfield v City of Saline*, 103 Mich. App. 99,

104-105 (1981).  "Also, ambiguous statutes [must] be interpreted as a whole and

construed as to give effect to each provision and to produce a harmonious and

consistent result."  *Id* at 105.

ii.    **The Peddler's Ordinance is not Ambiguous and it**

**Does Not Apply to Plaintiff's Newspaper
Deliveries or Random Sales**

The ordinance defines peddlers, solicitors and canvassers as persons "engaged in the business or occupation" of selling, or taking orders for, goods or services. Pl. Exh. 18, §12-171. The parties do not claim, and the Court does not find, that there is any overt or latent ambiguity in this language. And, there is no evidence that Plaintiff was ever engaged in either business. His undisputed testimony is that he did not solicit subscribers or individual customers in City Hall. He merely delivered papers to existing Flint Journal customers. If asked, he referred prospective new subscribers to the Flint Journal directly, and the Flint Journal issued Plaintiff a check for his portion of the subscription fees. This evidence indicates that Plaintiff only actively engaged in the business of making deliveries in City Hall. To the extent Plaintiff made occasional individual sales, the evidence shows that they were merely incidental to his primary business--delivery to subscribers. Consequently, the Court finds that Plaintiff was not a peddler, solicitor or canvasser within the meaning of the peddler's ordinance.

### iii.   There was no Probable Cause for an Arrest and Williamson is not Entitled to Qualified Immunity

Because the ordinance did not apply to Plaintiff, his arrest for an alleged violation of the ordinance was without probable cause. Therefore, Plaintiff has established that his Fourth Amendment rights were violated. The Court's inquiry is not complete, however, because Williamson contends that he is, nevertheless, entitled to qualified immunity.

Even when a constitutional right has been infringed, government officials who

14

perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The court must employ a standard of objective reasonableness and analyze claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the officer's position could have believed that his or her conduct was lawful, in light of clearly established law and the information he possessed.  *Id*; *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994)  ( "[T]he question is whether any [government official] in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.") (*quoting Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir.1989)).

The ultimate burden rests with plaintiff to show that the defendant is not entitled to qualified immunity.  *Gardenhire*, 205 F.3d at 311. However, "[t]he defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question."  *Id*.  Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct."  *Id*.  Whether a Defendant is

15

entitled to qualified immunity is a question of law, unless the facts on which the decision must be based are in dispute. *Brandenburg*, 882 F.2d at 215; *Gardenhire*, 205 F.3d at 311; *Adams*, 31 F.3d at 387.

Plaintiff satisfied both prongs of the qualified immunity analysis. It is clearly established that an arrest without probable cause violates the Fourth Amendment. *Klein v Long*, 275 F.3d 544, 550 (6th Cir. 2001). And, a reasonable person in the Mayor's position would have known that instigating a false arrest violated that clearly established Fourth Amendment right. Therefore, Defendant Williamson is not entitled to qualified immunity on Plaintiff's Fourth Amendment claim. His motion on this claim is denied.

### 2.    First Amendment

Plaintiff does not challenge the constitutionality of either the Executive Order or the peddler's ordinance. He only argues that neither applied to him and that, in violation of the First Amendment, the regulations were only asserted as a pretext for Williamson's real motives--1) retaliation for Plaintiff's challenge of Williamson's authority; 2) retaliation for Plaintiff's refusal to divulge the names of subscribers; and 3) Williamson's desire to prohibit distribution of Flint Journals in particular (as opposed to newspapers in general) because of its critical coverage of him. There is a question of fact on the first and third basis that Plaintiff claims a First Amendment violation. The second claim fails on the merits.

Before reaching the merits, however, Defendants assert that Plaintiff's retaliation claims are untimely because they were not pled. Defendants argue that Plaintiff only pled a violation based on his claimed right to distribute newspapers. Therefore,

16

Defendants ask the Court to disregard the retaliation claims.

Plaintiff's retaliation claims were not explicitly pled. But, in the general allegations section of the Amended Complaint, Plaintiff alleges the underlying facts for each retaliation claim. *See* Amended Complaint at ¶¶5, 11. And, he generally alleges that "Defendants stop, frisk, detention and arrest of Plaintiff because he was delivering newspapers to subscribers of the Flint Journal at City Hall was in violation of his rights under the First . . . Amendment." Amended Complaint at ¶16. In later paragraphs, however, Plaintiff only asserts that Defendants' actions had a chilling effect on his right to distribute newspapers to Flint City Hall subscribers, without reference to the alleged acts of retaliation. *Id* at ¶18. This language is the apparent basis for Defendants' assertion that Plaintiff only pled a violation of his right to distribute newspapers. During oral argument, Plaintiff asserted that his claims are sufficiently pled. But, he alternatively requested that he be allowed to amend his complaint.

The Court will permit Plaintiff to amend his complaint to explicitly state the multiple grounds of his First Amendment claim. FRCP 15(a) states that leave to amend "shall be freely given when justice so requires." "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits[,]" unless there is undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or amendment would be futile. *Foman v Davis*, 371 U.S. 178, 182 (1962). "Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical

17

2:04-cv-74379-VAR-RSW   Doc # 47-2   Filed 06/20/06   Pg 18 of 35   Pg ID 681

factors in determining whether an amendment should be granted." *Head v Jellico Housing Authority*, 870 F.2d 1117, 1123 (1989).

The Federal Rules of Civil Procedure's liberal notice pleading doctrine only requires a plaintiff to give "a short and plain statement of [his] claim showing that [he] is entitled to relief." FRCP 8(a)(2). Such a statement is sufficient if it gives a defendant fair notice of the claim and the grounds upon which the claim is based. *Smith v City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004). Plaintiff's general allegations were sufficient under this standard to put Defendants on notice of the First Amendment claims alleged against Williamson. And, Defendants do not assert that they will be substantially prejudiced if Plaintiff is allowed to amend his complaint to explicitly plead his retaliation claims. Nor do Defendants allege that any of the other factors that mitigate against allowing an amendment are present. Therefore, Plaintiff may amend his complaint to explicitly state all of the grounds for his First Amendment claim.

### a.    Retaliation Claims

Turning to the merits, an arrest made in retaliation for the exercise of a constitutionally protected right is actionable under §1983. *See Greene v Barber*, 310 F.3d 889, 895 (6th Cir. 2002). In order to prove a claim of retaliation, a plaintiff must establish:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

18

*Bloch v Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  Additionally, recent United States

Supreme Court and Sixth Circuit decisions now require that claimants who assert they

were arrested or prosecuted in retaliation for the exercise of First Amendment rights

also plead and prove a lack of probable cause for the underlying charge.  *See Hartman*

*v Moore*, ___ U.S. ___, 126 S.Ct. 1695 (2006); *Barnes v Wright*, ___F.3d. ___, 2006

W.L. 1506714 (6th Cir. 2006).

Until now, there has been a split among the circuits:  Must plaintiff prove an

absence of probable cause to sustain a claim that he was prosecuted in retaliation for

protected conduct?  *See Wood v Kesler*, 323 F.3d 872, 883 (11th Cir. 2003)(requiring

evidence of a lack of probable cause); *Keenan v Tejeda,* 290 F.3d 252, 260 (5th Cir.

2002)(same); *Mozzochi v Borden*, 959 F.2d 1174, 1179-1190 (2nd Cir. 1992)(same);

*Poole v County of Otero,* 271 F.3d 955, 961 (10th Cir. 2001)(plaintiff not required to

prove the absence of probable cause); *Haynesworth v Miller,* 820 F.2d 1245, 1256-1257

(D.C. Cir. 1987)(same).  Historically, the Sixth Circuit has not required a plaintiff to

prove an absence of probable cause.

For instance, in *Greene v Barber,* 310 F.3d 889 (6th Cir. 2002)*,* plaintiff was

arrested for violating a city ordinance prohibiting disturbances in public places after

plaintiff loudly called the officer a profane name in front of others in a municipal

building.[4]  After he was acquitted, plaintiff brought a §1983 claim alleging, *inter alia*, that

he was arrested in retaliation for exercising his First Amendment right.  The district court

---

[4]Plaintiff was angry that his vehicle had been impounded.  While disputing the
validity of the fees that he was charged to recover his vehicle, plaintiff called the officer
an "asshole."

19

granted summary judgment in favor of the arresting officer (and other named

defendants).  The Sixth Circuit reversed.

On appeal, plaintiff argued that the lower court's grant of summary judgment was

erroneous because he was arrested without probable cause and because of his

protected speech.  The *Greene* Court found that the arresting officer did have probable

cause to believe that plaintiff violated the ordinance, but that plaintiff's claim was still

viable since there was evidence of a retaliatory motive for the arrest:

> [T]he existence of probable cause is not determinative of the
> constitutional question if, as alleged here, the plaintiff was arrested in
> retaliation for having engaged in constitutionally protected speech.
> The law is well established that "[a]n act taken in retaliation for the
> exercise of a constitutionally protected right is actionable under
> §1983 even if the act, when taken for a different reason, would have
> been proper."

310 F.3d at 895 (*quoting*, *Bloch*, 156 F.3d at 681-682).

However, on April 26, 2006, approximately one month after briefing was

complete in this matter, the United States Supreme Court resolved the circuit split.  In

*Hartman v Moore*, *supra*, the Court held that when a plaintiff claims to have been

prosecuted for exercising First Amendment rights, the plaintiff must plead and prove a

lack of probable cause for the underlying criminal charge in order to sustain a First

Amendment retaliation claim.

In *Hartman*, Plaintiff alleged that postal inspectors induced the attorney general

to bring bogus charges against him and his company in retaliation for his advocacy in

favor of mail-reading technology the inspectors opposed.  After the charges were

20

dismissed by the trial court due to a lack of direct evidence against plaintiff or his company, plaintiff brought a *Bivens*[5] civil action against the federal officials (which the Court acknowledged is the counterpart for §1983 civil actions against state officials).

In the district court, the inspectors requested summary judgment.  They argued that they were entitled to qualified immunity because the underlying criminal charges were supported by probable cause.   Because the D.C. Circuit--like the Sixth Circuit-- allowed such claims even if there was probable cause, the district court denied the motion.  The D.C. Circuit Court of Appeals affirmed.  The Supreme Court granted *certiorari*.

*Hartman* held that a plaintiff must allege and prove an absence of probable cause in First Amendment claims of retaliatory prosecution.  The Court reasoned that 1) probable cause will likely figure prominently in any retaliation case, because its presence or absence has significant evidentiary value in support or defense of such claims, and 2) a showing that there was no probable cause will establish the necessary causal connection between retaliatory animus and injury to the plaintiff, particularly when the prosecution was induced by a nonprosecuting official.  126 S.Ct. at 1703-1707.

In supplemental briefing, Plaintiff argued that *Hartman* is factually distinguishable from this case and *Greene*, because *Hartman* involved a claim of retaliatory

---

[5]*Bivens v Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

prosecution, rather than retaliatory arrest.[6]  Because of this factual difference, Plaintiff

asserts that the *Hartman* Court's concern about a gap in causation does not apply in

instances such as this one where the allegation is asserted directly against the

instigating party, rather than a third party prosecutor.  Therefore, Plaintiff contends that

*Hartman* does not overrule *Greene*.

One day after Plaintiff filed his supplemental brief, however, the Sixth Circuit

issued an opinion in which it unequivocally states that *Hartman* modified its holding in

*Greene*.  In *Barnes v Wright*, ___F.3d. ___, 2006 W.L. 1506714 (6th Cir. 2006)(June 2,

2006), the Sixth Circuit interpreted *Hartman* more broadly than Plaintiff advocates.

Although the *Barnes* plaintiff's First Amendment retaliation claim was brought directly

against the officers who initiated grand jury proceedings against him, rather than against

an intervening prosecutor, the Court held that the *Hartman* ruling was broad enough to

encompass plaintiff's claim:

> The concerns regarding the intervening actions of a prosecutor do
> not apply in this case, because the officers themselves initiated the
> grand jury proceedings against Barnes. However, in its analysis,
> *Hartman* appears to acknowledge that its rule sweeps broadly; the
> Court noted that causation in retaliatory-prosecution cases is "
> *usually* more complex than it is in other retaliation cases." [*Hartman*,
> 126 S.Ct.] at 1704 (emphasis added). Regardless of the reasoning, it
> is clear that the *Hartman* rule modifies our holdings in *McCurdy* [*v
> Montgomery County, Ohio*, 240 F.3d 512 (6th Cir. 2001)] and *Greene*
> and applies in this case.

2006 W.L. 1506714 at *9.  Accordingly, the *Barnes* Court held that plaintiff's First

---

[6]The *Greene* plaintiff actually was prosecuted and acquitted.  But, unlike
*Hartman*, the *Greene* plaintiff did not sue the prosecutor.

Amendment retaliation claim failed as a matter of law, because defendants had probable cause to pursue an indictment against him.

Under *Hartman* and *Barnes*,[7] proof of a lack of probable cause is an additional element of a First Amendment retaliation claim.  For the reasons already stated, Plaintiff satisfied his burden on this element.  And, to the extent Plaintiff failed to plead lack of probable cause in light of the precedent at the time he filed, he will be allowed to amend his complaint.

The Court will now consider whether Plaintiff has satisfied his burden on the remaining *Bloch* elements, with respect to his two First Amendment retaliation challenges.  The remaining *Bloch* elements are:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch*, 156 F.3d at 678.

### i.      Right to Challenge Authority

The first *Bloch* element is whether Plaintiff was engaged in constitutionally protected activity.  Plaintiff is correct that a citizen has a First Amendment right to verbally challenge or criticize a government official's authority.  *See McCurdy v*

_____

[7]Plaintiff's attempt to distinguish *Barnes* on its facts, because *Barnes* involved a retaliatory arrest and indictment and this case only involves a retaliatory arrest, is not well taken as it is directly contrary to *Barnes* broad interpretation of *Hartman*.

*Montgomery County, Ohio*, 240 F.3d 512 (6th Cir. 2001); *Bloch*, 156 F.3d at 678.  In

*McCurdy*, plaintiff was arrested in front of his home after he refused the defendant

officer's demand that he and his guests show identification, and that he go inside the

house.  The officer began to question Plaintiff and his guests when he drove by and saw

them outside at 5:00 a.m.  Plaintiff was seeing his guests to their cars.  He had been

drinking, but there were no complaints from neighbors about Plaintiff or his guests.

Plaintiff used profane language in response to the officer's questioning and disputed the

officer's authority to either demand identification or order him into his home.  Plaintiff

was arrested for disorderly conduct and public intoxication.

The *McCurdy* Court stated that plaintiff had a constitutional right to verbally

challenge the officer's surveillance.  Therefore, the Court reversed the district court's

grant of qualified immunity and remanded the case with directions to the district court to

address whether the officer's arrest was at least partially motivated by protected

conduct.  Plaintiff here, likewise, had a right to verbally challenge Williamson's authority

to prohibit him from making deliveries.  Therefore, he has established that he was

engaged in constitutionally protected activity.

The second element is whether the defendant's adverse action caused the

plaintiff to suffer an injury that would likely chill a person of ordinary firmness from

continuing to engage in that activity.  The adverse action was Williamson's instigation of

Plaintiff's arrest.  An arrest would likely dissuade "a person of ordinary firmness" from

continuing to engage in protected conduct.  *See Bolan v City of Keego Harbor*, 2002

W.L. 31545997, *4 (E.D. Mich. 2002); *Palma v Atlantic County*, 53 F.Supp.2d 743, 753

(D. N.J. 1999); *Wallace v Brewer*, 315 F.Supp. 431, 454 (D.C. Ala. 1970).  The second element is met.

Lastly, Plaintiff must show that the adverse action was motivated, at least in part, by his exercise of his constitutional right.  Plaintiff presented sufficient evidence to raise a question of fact on this element.  Months prior to this incident, Williamson initiated a boycott of the Flint Journal because of its critical coverage of him.  He also said in an interview about Plaintiff's arrest that Flint Journals were not allowed on City Hall property, although another newspaper was allowed and, indeed, provided by the Mayor's office.  And, just prior to calling Chief Hagler to request Plaintiff's arrest, Williamson allegedly said, "I'll show you how much authority I have."  Pl. Exh. 10 at p. 50.  These actions and statements are sufficient to allow a jury to consider whether Williamson called for Plaintiff's arrest in retaliation for Plaintiff's exercise of his First Amendment right to challenge Williamson's authority.

### ii.      Disclosure of Subscribers

Plaintiff failed to meet his burden on his second retaliation claim, which is based on Williamson's alleged retaliation because Plaintiff refused to identify his subscribers.  The first two *Bloch* elements are met.  "Compulsory disclosure of the names of an organizations' members may in certain instances infringe constitutionally protected rights of association."  *Communist Party of U.S. v Subversive Activities Control Bd.,* 367 U.S. 1, 91 (1961).  And, as stated, the threat of arrest would undoubtedly chill a reasonable person from exercising his right of nondisclosure.  However, Plaintiff has not presented evidence that his refusal to give the names of subscribers was a factor in

Williamson's actions against him. Plaintiff testified that Williamson called for his arrest *before* he asked for the names. There is no evidence that Williamson made further demand for names after the officers arrived, or that Williamson directly or impliedly suggested that he would rescind his arrest request if disclosure was made. Plaintiff failed to establish a constitutional violation on this ground.

### b.    Plaintiff's Right to Distribute Newspapers

Plaintiff's remaining First Amendment claim is that Williamson infringed upon his constitutional right to distribute newspapers. The right to circulate newspapers is protected by the First Amendment. *City of Lakewood v Plain Dealer Publishing Co.,* 486 U.S. 750, 768 (1988); *Lovell v City of Griffin*, 303 U.S. 444, 452 (1938); *Globe Newspaper Co. v Beacon Hill Architectural Commission*, 100 F.3d 175, 182 (1st Cir. 1996). "The '[l]iberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value.'" *City of Lakewood*, 486 U.S. at 768 (*quoting Ex Parte Jackson,* 96 U.S. 727, 733 (1878)). And, contrary to Defendant Williamson's assertion, "the degree of First Amendment protection is not diminished merely because the newspaper . . . is sold rather than given away." *Id* at 756 n. 5 (citing *Pittsburgh Press Co. v Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973); *News and Sun-Sentinel Co. v Cox*, 702 F.Supp. 891, 898-899 (S.D. Fla. 1988).

However, Plaintiff acknowledges that the government is not obligated to allow the unfettered exercise of protected speech on property it owns. *International Society for Krishna Conciousness, Inc. v Lee,* 505 U.S. 672, 678 (1992); *Cornelius v NAACP*

*Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 799-800 (1985).  The government may impose restrictions on access, subject to varying levels of scrutiny based upon the type of forum at issue.  This is known as the "public forum doctrine," which recognizes three types of forums: "the traditional public forum, the public forum created by government designation, and the nonpublic forum."  *Jobe v City of Catlettsburg*, 409 F.3d 261, 266 (6th Cir. 2005), *cert. den.,* 126 S.Ct. 389 (2005).

The traditional public forum includes "government property that has traditionally been available for public expression," such as public streets and parks.  *Lee*, 505 U.S. at 678; *Jobe*, 409 F.3d at 266.  The designated public forum includes property that the government intentionally designated as a forum for expressive activity by part or all of the public.  *Cornelius*, 473 U.S. at 800; *Lee*, 505 U.S. at 678.  The nonpublic forum is "all remaining public property."  *Lee*, 505 U.S. at 678.

Traditional and designated public forums are subject to the highest scrutiny.  Regulation of speech in such forums "survive only if they are narrowly drawn to achieve a compelling state interest."  *Id*.  The least scrutiny is imposed on nonpublic forums.  "The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view."  *Id*.

Defendant City of Flint asserts, Plaintiff does not dispute, and the Court agrees as well, that City Hall is a nonpublic forum.  Municipal buildings are not traditionally regarded as forums for expressive activity, and there is no evidence that Flint City Hall was ever designated for that purpose.  *See Sammartano v First Judicial District Court*,

27

303 F.3d 959, 966 (9th Cir. 2002)(building operated for purpose of conducting business of the county and of the municipal and state courts is a nonpublic forum). Therefore, restrictions imposed by the City of Flint on newspaper deliveries in City Hall only need to be reasonable and viewpoint-neutral.

Plaintiff does not dispute that the Executive Order and the peddler's ordinance meet these criteria. But, he argues that Williamson's enforcement of the peddler's ordinance was not viewpoint-neutral. He claims that Williamson ordered him arrested to prevent him from distributing Flint Journals, as opposed to other newspaper publications. The Supreme Court has held that such selective enforcement is a violation of the First Amendment:

> Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, *the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.*

*Cornelius*, 473 U.S. at 806 (internal citations omitted).

There is evidence to support Plaintiff's claim. Williamson publicly spoke against the Flint Journal and initiated a boycott of the publication months earlier. And, after this incident, he made the comment to a reporter that Flint Journals were not allowed in City Hall, but that his office provided another newspaper publication in certain areas. Although Williamson made other comments within the same interview which suggest that Flint Journals could be sold in certain areas of City Hall, this conflict in Williamson's statements go to credibility, which must be weighed by the trier of fact. There is a

question of fact regarding whether Plaintiff's First Amendment rights were violated on this ground.

### c.   Williamson's Entitlement to Qualified Immunity on the First Amendment Claims

Williamson's defense of qualified immunity is moot with respect to Plaintiff's claim that Williamson retaliated against him for refusing to disclose subscribers.  And, the Court cannot decide as a matter of law whether Williamson is entitled qualified immunity on Plaintiff's right to distribute newspapers and his challenge to Williamson's authority; the facts upon which the Court's decision would turn are in dispute.  *See Gardenhire*, 205 F.3d at 311.

Defendant Williamson's motion for summary judgment on Plaintiff's First Amendment claim is denied with respect to Plaintiff's claim that Williamson retaliated against him for challenging his authority and that he infringed upon Plaintiff's right to distribute newspapers.  Defendant Williamson's motion is granted on Plaintiff's claim that Williamson retaliated against him for failing to disclose subscribers.

### B.   Claims Against City of Flint

Plaintiff asserts his First and Fourth Amendment claims against the City of Flint under a theory of municipal liability.

Plaintiff is not entitled to proceed against the municipality on the First Amendment claim which failed against Williamson as a matter of law. *City of Los Angeles v Heller*, 475 U.S. 796, 799 (1986).  And, for the reasons stated below, Plaintiff's remaining First and Fourth Amendment claims fail on the merits.

29

Municipalities can be held liable "pursuant to official municipal policy of some nature [which] caused a constitutional tort." *Monell v New York City Dep't of Social Services*, 436 U.S. 658, 691 (1978). Plaintiff contends that the City is liable by virtue of Williamson's actions as a policymaker, rather than a City employee. To prevail on this claim, Plaintiff must establish that he suffered a constitutional violation pursuant to the municipal policy of an official with final policymaking authority, as opposed to a municipal policy or custom directly attributable to the City. *See Pembaur v City of Cincinnati*, 475 U.S. 469, 479-480 (1986).

Once a municipal policy is established, "municipal liability may be imposed [even] for a single decision by [a] municipal policymaker[] under appropriate circumstances." *Pembaur*, 475 U.S. at 480. *See also Oklahoma v Tuttle*, 471 U.S. 808, 822 (1985). "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur,* 475 U.S. at 481. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Monell*, 436 U.S. at 694. The *Pembaur* Court stated that, "[i]f the decision to adopt [a] particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." 475 U.S. at 481. That is, the Court noted that "policy" is defined as "a specific decision or set of decisions

30

designed to carry out a chosen course of action"[8] or as "[a] course of action adopted and pursued by a government, party, ruler, statesman, etc. . . ."[9] *Id* at 481 n. 9.

The Court's inquiry here then is three-fold: 1) Was there a decision 2) by a final policymaker 3) that resulted in a constitutional violation?

### 1.    The Decision

The decision which triggered action against Plaintiff was Executive Order #04-0007--the policy pertaining to City employees reading/storing newspapers on City Hall property.  The evidence shows that Williamson met Plaintiff in an elevator and saw that he had newspapers.  He asked Plaintiff what he (Plaintiff) was doing.  Plaintiff said that he was delivering papers to his subscribers.  Williamson then asked Plaintiff if he was aware of the Executive Order.  He also asked Plaintiff if he had a peddler's license. Although the Executive Order was not mentioned when Williamson made the call for Plaintiff's arrest, Captain Sutter testified that he (Sutter) was aware of the Executive Order and that Sergeant Lipp discussed the Order with Plaintiff.  Sergeant Lipp made sure that Plaintiff was aware of the Order before he and Sutter released Plaintiff.  These facts clearly establish that Williamson's policy on newspapers, and Plaintiff's assertion of authority to deliver them precipitated Williamson's actions against Plaintiff.

### 2.    Final Policymaker

Who is a final policymaker is a question of law--and a question of state law--for

---

[8]*Quoting* Webster's Third New International Dictionary 1754 (1981).

[9]*Quoting* VII Oxford English Dictionary 1071 (1933).

purposes of §1983 liability.  *City of St. Louis v Praprotnik*, 485 U.S. 112, 124

(1988)("The States have extremely wide latitude in determining the form that local

government takes . . . . Among the many kinds of municipal corporations, political

subdivisions, and special districts of all sorts, one may expect to find a rich variety of

ways in which the power of government is distributed among a host of different officials

and official bodies.").

On July 14, 2004, Williamson signed Executive Order #04-0005, "Establishment

of a City Policy to Require Enforcement of Executive Orders."  In the Order, Williamson

purports to enact it under the authority of state law, the Flint Charter and all applicable

laws.  One week earlier, on July 7, 2004, Williamson signed Executive Order #04-0007,

"Establishment of City Policy Regarding the Storage and Reading of Newspapers,

Magazines and Other Reading Materials by City Employees."  Williamson asserts the

same authority as stated in Order #04-0005.

Nothing was presented to the Court which indicates that Williamson did not have

authority to enact Executive Orders, or that the Flint City Council challenged the Orders

at issue here.  Nothing was presented which indicates that Williamson's Executive

Orders were reviewable by the City Council.  Therefore, one would have to conclude

that policy decisions made by the Mayor  would be attributable to the City itself.  *See*

*Praprotnik*, 485 U.S. at 126.

Finally, and more specifically, no evidence suggests that Williamson did not have

authority to issue policy concerning the exercise of First Amendment rights in a

nonpublic forum.  In fact, Plaintiff does not challenge the constitutionality of Order #04-

32

0007, and the Court takes no position on whether it is a reasonable regulation of First Amendment rights on City property.

In *Pembaur,* the Court recognized that "the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level." 475 U.S. at 480. The isolated decision of an executive municipal policymaker, therefore, could give rise to municipal liability under §1983.

The Court concludes that Williamson, as Mayor, was a final policymaker with the ability to regulate speech on City property, and that whatever policy he enacted in this area was policy of the City of Flint.

### 3.    Constitutional Violation

For purposes of this analysis, the Court assumes that Plaintiff's constitutional rights were violated. The question is, did Executive Order #04-0007 cause the Flint police to violate Plaintiff's constitutional rights? Put another way, was it highly predictable that enforcement of Order #04-0007 would deprive a person such as Plaintiff of his constitutional rights, such that it reflected a conscious disregard on the part of the City of Flint, to this deprivation? Was the violation of Plaintiff's constitutional rights a plainly obvious consequence of calling law enforcement to arrest him? The Court answers all of these questions, "No."

The Executive Order did not give Williamson arrest powers, or the authority to cause an arrest of anyone. In fact, the Executive Order gave no arrest powers to anyone. In making arrests, police officers have no alternative but to act in accordance with the established standard, which is to only make arrests when there is probable

33

cause.  Therefore, the officers who responded to Williamson had an obligation to make the proper inquiry before arresting Plaintiff.

*Pembaur* holds that municipal liability under §1983 attaches "where--and only where--a deliberate choice to follow a course of action is made from various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  475 U.S. at 483.  *See also Tuttle*, 471 U.S. at 823 ("[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives.")(footnote omitted).  Here, the arresting officers had but one choice--even though Williamson insisted on Plaintiff's arrest.  They were not authorized--based on any municipal policy--to arrest other than on probable cause.  A police officer's deliberate or mistaken departure from the controlling law of arrest would not represent municipal policy.  *See Pembaur*, 475 U.S. at 486 (J. White concurring).

The same analysis would apply if the Court determined that the "decision" at issue was the decision by Williamson to have the Plaintiff arrested for violating the peddler's ordinance--no municipal policy extended that power to the Mayor and the arresting officers had an obligation to follow controlling law.

For these reasons, the Court finds that Plaintiff has not sustained his burden to demonstrate that a constitutional violation occurred as a direct result of the Executive Order.  Defendant City of Flint's motion for summary judgment is granted.

## V.    CONCLUSION

Defendant City of Flint's Motion for Summary Judgment is **GRANTED** in its entirety. Defendant Williamson's Motion for Summary Judgment is **GRANTED** only on

Plaintiff's First Amendment claim of retaliation due to his refusal to name his subscribers.  The balance is **DENIED**.

Trial will proceed on Plaintiff's claims against Williamson only:

1.       Fourth Amendment violation;

2.       First Amendment violation: (a) right to challenge authority; and (b) right to distribute newspapers.

**IT IS SO ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  June 20, 2006

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on June 20, 2006.

s/Linda Vertriest
Deputy Clerk